[S. F. No. 7759.   In Bank.—February 9, 1917.]

## CLAREMONT COUNTRY CLUB (a Corporation), et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

WORKMEN'S COMPENSATION ACT—COUNTRY CLUB—CADDY EMPLOYED ON GOLF LINKS — LIABILITY OF CLUB AS EMPLOYER.—A country club which owns and maintains a golf links for its members, and supplies caddies for their use, while playing the game, whose employment and discharge during all of the time when they are not actually in the service of a member remain wholly under its control, occupies the status of an employer to such caddies, and is liable under the Workmen's Compensation Act for an accidental injury to a caddy while in the service of a member, notwithstanding the member pays the caddy for his service and directs his activities while actually caddying.

ID.—EMPLOYMENT LIMITED TO CERTAIN DAYS.—The fact that the injured caddy reported for duty and was employed only on specified days does not affect his status as an employee.

ID.—INJURY TO MINOR — BASIS OF COMPENSATION — FUTURE EARNING CAPACITY.—In awarding compensation to such caddy, who was a minor, the Industrial Accident Commission was authorized, under section 17 of the Workmen's Compensation Act, to take into consideration the increased wage which he might be fairly expected to earn.

APPLICATION for a Writ of Certiorari to review an award of the Industrial Accident Commission of the State of California.

The facts are stated in the opinion of the court.

Redman & Alexander, for Petitioners.

Christopher M. Bradley, for Respondent.

HENSHAW, J.—Review to annul an award of the Industrial Accident Commission. On March 7, 1915, Raymond Harris, a boy fourteen years of age, while caddying for a member of the Claremont Country Club, leaned against the hand-rail of a bridge spanning a small creek on the golf course of the club. The rail gave way and the boy fell backward into the creek, suffering a permanent injury to one of his elbows. He filed his claim for compensation with the In-

dustrial Accident Commission. The Claremont Country Club and its insurer, the Aetna Life Insurance Company, answered, denying only the fact of employment. The commission, after hearing, awarded the applicant $1,170, in addition to his outlay for medical attendance.

The principal contention of petitioners is that the boy was not an employee of the country club within the meaning of the provisions of the code and the terms of the Workmen's Compensation Act, [Stats. 1913, p. 279]. The undisputed facts are that the club owns and maintains a golf links for the pleasure of such of its members as desire to indulge in the game. The general control over this sport is vested in appropriate committees selected from the club members. Many golfers have desired, and do desire, the services of attendants to carry their golf bags, to aid in the search for the ball, and to perform other like familiar services. For these members the club provides caddies, and over them is a paid employee known as the caddy-master. The club also maintains a caddy-house, which is the station of the caddies until their services are requisitioned. The caddies are graded into three classes, based upon their records and abilities in the service, the best belonging to class "A," the next best to class "B," and the beginners and least efficient to class "C." "A" class caddies are paid sixty cents, "B" class caddies fifty cents, and "C" class caddies forty cents a game. A player requisitioning a caddy may not designate the boy whose services he desires. His request is made to the caddy-master, who, under a system, summons the caddy whose turn it is to serve. The caddy is supplied with a card, whereon at the conclusion of the game the member makes his report to the caddy-master, with remarks touching the service and qualifications of the boy, and from time to time the caddy-master regrades his caddies in accordance with these reports. At the close of the game the player hands to the caddy-master, with his report, the amount earned by his caddy, and this amount is immediately delivered by the caddy-master to the boy. Thus each player pays the caddy, and the indirect method of payment through the caddy-master is apparently designed for the twofold purpose of convenience in making change and as a check on "tips" or donations by the members to the caddy in excess of the actual amount earned. The boys are taken on by the club through the caddy-master

or Greens Committee, and the caddy-master or Greens Committee is empowered to discharge a caddy, or, in other words, to forbid him to frequent the golf links and seek and secure employment. Upon the other hand, while actually caddying, the control of the activities of the boy are wholly with the member using him, and the club, as a club, has of course no means of knowing what particular orders or directions a member may give to his caddy, nor what unusual or dangerous duties he may call upon him to perform. For these reasons petitioners argue that the caddies are not employees of the club, and that "all that the club does is to afford boys who wish to serve as caddies an opportunity for employment by the members of the club who play golf." For this position petitioners believe they find full support in section 2009 of the Civil Code, in *Boswell* v. *Laird,* 8 Cal. 469, [68 Am. Dec. 345], in *Fay* v. *German General Ben. Soc.,* 163 Cal. 118, [124 Pac. 844], and *Brown* v. *Smith,* 86 Ga. 274, [22 Am. St. Rep. 456, 12 S. E. 411]. Touching section 2009 of the Civil Code, petitioners insist that the status of the caddy is that of a servant, as he is employed to render personal service, and that if it be conceded that he would be a servant of the club, while rendering personal service at the direction of the club, the relationship ceases entirely when he is actually engaged in caddying for a member, since by virtue of that engagement he no longer is "entirely under the control and direction" of the Claremont Country Club, but is entirely under the control and direction of the member, who thus becomes "his master." But such refinement of reasoning makes no stronger appeal to us than it has to other courts. Section 1965 of the same code has a bearing upon the matter, and that defines a contract of employment (under which, of course, the relationship of employer and employee necessarily arises) to be "a contract by which one, who is called the employer, engages another, who is called the employee, to do something for the benefit of the employer, or of a third person." The reasoning, we say, makes no strong appeal to us, because the language of section 2009 was never intended to mean, for example, that a housemaid, directed to give personal attention and service to a guest within the house, ceased for that reason to be an employee or servant of the householder. No more do waiters in restaurants and cafés who, while attending to the requirements of the patrons and in

contract bound to comply with all the reasonable requests of those patrons, cease to be employees of the owners of the particular establishment. Nor indeed is the method of compensation determinative. Taking the single case of waiters, it is a well-known fact that in some establishments they receive no wage from their employers, and are dependent entirely upon the "tips" which come from the persons they serve, and it is equally a well-known fact that in some instances this system is carried to such an extent that the waiters themselves pay the employers to obtain the employment. So here it is not of consequence that the member should pay to the caddy directly the amount he has earned, or pay it indirectly through the medium of the caddy-master. The employment and discharge of the caddy during all of the time when he is not actually in the service of a member is wholly under the control of the country club, and this is the determinative fact in the matter. In certain of its features the case is not dissimilar to *Gaines* v. *Bard,* 57 Ark. 615, [38 Am. St. Rep. 266, 22 S. W. 570], where it is held that a bathroom attendant, selected and subject to be discharged by the owner, and performing service for him in keeping the bathrooms and the adjacent halls clean, is his servant, notwithstanding the fact that he paid such attendant no compensation, and the only compensation which he received was the donations from the patrons under whose control he was while performing service for them. The foregoing, we think, will certainly show the inappositeness of such authorities as *Brown* v. *Smith,* 86 Ga. 274, [22 Am. St. Rep. 456, 12 S. E. 411], where the holding is merely that where a master has hired his servant to another, giving the other the complete and absolute control and direction of the servant, with the exclusive right to discharge him, the original master is not liable for his negligence. Wherefore upon this point our own cases, above cited, dealing with the general features of the relationship of employer and employee and master and servant do not call for review, for these caddies are employed by the club, are controlled by the club, and the service which they render simply happens from its nature to be directed to contribute to the convenience and pleasure of the individual members of the club.

The fact that the injured boy reported for duty and was employed only on specific days does not militate at all against

the proposition that he was an employee.  (*Dewhurst* v. *Mather*, 2 K. B. 754.)

The final complaint of petitioners is that the amount of the award is not justified by the evidence.  Elements of uncertainty in this evidence are pointed out by the petitioners, as that it was based upon the earning capacity of a first-class caddy, and there was no assurance that the injured boy would become a class "A" caddy; also that there was no assurance that when he attained his majority he would pursue the vocation of a caddy; and as little assurance that if he did pursue the vocation, he would follow it every day instead of only on Saturdays and Sundays, as he was then doing.  These statements are unquestionably true, but nevertheless the law itself takes knowledge of them and defines the duties of the Industrial Accident Commission under the indicated circumstances.  The evidence did show that the basis of the award was within the earning capacity of good caddies.  The act itself (Stats. 1913, sec. 17, c. 176, p. 289), provides as follows: "If the injured employee is a minor, and his incapacity, whether total or partial, is permanent, his average weekly earnings shall be deemed, within the limits fixed, to be the weekly sum, that under ordinary circumstances he would probably be able to earn after obtaining the age of twenty-one years, in the occupation in which he was employed at the time of the injury, if he had not been injured."  And it is held, supporting such a law, that it is proper to take into consideration the increased wage which a minor may be fairly expected to earn.  (*Kilberg* v. *Vitch*, 171 App. Div. 89, [156 N. Y. Supp. 971].)

The award is therefore affirmed.

Lorigan, J., Melvin, J., Shaw, J., Sloss, J., Lawlor, J., and Angellotti, C. J., concurred.