LOMA v INDUST. COMM.

Ohio Appeals, 8th Dist, Cuyahoga Co.

No. 17542.   Decided April 22, 1940.

## OPINION

By TERRELL, J.

The facts in this case are stated more in detail in the dissenting opinion, than I expect to state them here.

The claimant, a caddie boy on a golf course, while waiting for an assignment for service as a caddie, and while in the caddie pen where he was required to be by the management of the golf club, engaged in a friendly scuffle with another caddie. The claimant had been using his pocket knife in cutting an apple preparatory to eating it. Another caddie, Stonebrook, remarked, "Your knife is not sharp." The claimant thereupon informed Stonebrook that he would show him if the knife was sharp by using it upon him. The claimant then proceeded toward Stonebrook with the blade of the knife open, in play however, and got Stonebrook down on the ground. Stonebrook apparently to protect himself, but realizing all the time that the whole proceeding was in play, lifted his leg and accidentally touched the arm or hand of the claimant, forcing the blade of the knife into claimant's leg. Infection and gangrene later set in, causing amputation of the leg of the claimant, for which he now seeks compensation.

The question presented for our determination is,—did the injuries to the claimant arise out of, or were they occasioned in the course of his employment?

The law, under the Workmen's Compensation Act, seems to be well settled in this respect, that to be compensable an injury to an employee must not only occur during the time of his employment, and in the place of his employment, but it must also arise out of the employment, so that there is some proximate causal connection between the accidental injury and the employment.

C. K. Snyder, Esq., Cleveland, for plaintiff-appellant.

William Durkin, Esq., Cleveland, for defendant-appellee.

Do the facts in this case warrant the conclusion that there is a proximate causal connection between the employment and the injury complained of?

There is some evidence that the employer in this case, through the caddie master knew that these caddies used pocket knives to amuse themselves in playing the games of "mumble-ty-peg" or "chubbies". It could not be fairly inferred from the fact that the caddie master knew these boys amused themselves with pocket knives in such games, that the caddie master consented to the use of such pocket knives in horseplay and wresting between the boys.

The pursuing of the fellow employe by the claimant, with an open knife, pretending even in play that he was about to use the knife upon his fellow employe to show him that it was sharp, can by no stretch of the imagination be considered as having been countenanced or approved by the caddie master.

At the time of the injury, the claimant was not performing a service for his employer by thus pursuing his fellow employe. His injuries occurred arising out of his own personal pursuit and not as an act for the benefit of, or in the service of his employer.

An employee who is injured when engaged in the employee's private and personal business, disconnected with the employment, is not entitled to compensation. **Industrial Commission v Ahern, 119 Oh St 41.**

An injury "in the course of employment" connotes an injury sustained in the performance of some required duty done directly or indirectly in the service of the employer. **Industrial Commission v Ahern, 119 Oh St 41.**

In the case of **Highway Oil Company v State ex rel, etc., 130 Oh St 175,** an employee was injured during the time of his employment and at the place of his employment, but the Court held there was no causal connection between the employment and the injury, and without establishing this causal connection, no recovery could be had.

The second syllabus of this case just cited, reads as follows:

"2. There is no causal connection between an employment and an accidental injury, and such injury does not result from or arise out of the employment, where an employee, in the course of his employment, as an attendant at a gasoline service station is injured by the accidental discharge of a firearm which he caused to be brought to the station at the request of a fellow employe for self-protection without the knowledge or acquiescence of the employer."

It may, with fair reason, be considered that if an employee was doing something that he was directly authorized to do, or which may fairly be implied from the nature of his employment and the duties incident thereto, or, if he was doing something at the time in furtherance of the master's business, he may be said to have been in the course of his employment for the master.

In the case at bar, however, it could not fairly be implied that in pursuing a fellow-employee, even in play, with an open knife, that he was doing any service in furtherance of his master's business or doing anything that he was authorized to do.

The Workmen's Compensation fund is not a general insurance fund to protect employees against all accidents and injuries. This fund may be called upon to compensate employees for injuries only in limited respects as set forth in the Constitution, and that is, that such injuries must occur in, and arise out of the course of employment.

"The causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment and to have

flowed from that source as a rational conse quence."

Highway Oil Company v State ex rel etc., 130 Oh St 179.

To use an analogy, in the case at bar, if, while claimant was cutting the apple preparatory to eating it, he had cut his finger and infection had later set in, causing the amputation thereof, could it then be said that the injury to his finger arose out of his employment, or was occasioned thereby? I do not think so. Such injury would have no causal relation to his employment, would not arise out of any act of the employee on behalf of his employer and would arise out of the employee's private and personal pursuit of his own business.

The trial court, in this case entered judgment against the claimant under the authority of **Industrial Commission of Ohio v Banks, 127 Oh St 517.** From a consideration of the matters herein set forth, and under the case of Industrial Commission v Banks, supra, we feel that the trial court made the correct application of the law to the situation in this case presented, and the judgment is therefore affirmed. Exceptions may be noted.

LIEGHLEY, J., concurs.
MORGAN, J., dissents.

By MORGAN, J. (Dissenting):

Plaintiff was a caddie employed by The Shaker Heights Country Club and he brings this action against the defendant to recover Workmen's Compensation for an injury suffered by him on August 29, 1936, his claim having been rejected on a rehearing. A jury was waived and the trial court entered judgment for the defendant on the authority of **Industrial Commission v Banks, 127 Oh St 517.**

The plaintiff, a boy fifteen years of age, about eight o'clock in the morning on the day he was injured, reported for duty at the country club and immediately went to the caddie pen. received his number from the caddie master. All caddies were required to remain in the pen awaiting a call for their services. A caddie might leave and go home, but if he did so without being excused, he was subject to discharge. The caddies, while awaiting their turn, were in the habit of playing "chubbies" or "mumble-ty-peg" with knives. The plaintiff, having an open knife in his hand while engaged in a friendly horseplay with another boy, accidentally had the knife driven into his leg, cutting the femoral artery. He was taken to a hospital where he remained for over six months. Gangrene set in, compelling an amputation of the leg below the knee.

The club employed a caddie master to supervise the caddies and the caddies were employed and discharged by the caddie master. The caddies were paid by the players on a fixed basis with occasional tips added.

The questions in this case are. (1), was the plaintiff an employee of the club? (2), if he was such an employee, did the employment have "any causal connection with the injury; either through its activities, its conditions or its environment" as is required by the syllabus in **127 Oh St 517?**

The first question has been considered and is decided in the highest courts of at least three (3) states. In the case of Claremont Country Club et al v Industrial Commission of California, 163 Pacific 209 a caddie was injured by the giving way of a hand rail on a bridge spanning a small creek on the golf course where the plaintiff was at work as a caddie. The Industrial Commission claimed that the boy was not an employee of the country club within the meaning of the Workmen's Compensation Act of California. The methods of hiring, controlling and paying the caddies were substantially the same as in the instant case. The court said in the California case:

"Nor indeed is the method of compensation determinative. Taking the single case of waiters, it is a well known fact that in some establishments they receive no wage from their employers

and are dependent entirely upon the "tips" which they receive from the persons they serve, and it is equally a well known fact that in some instances this system is carried to such an extent that the waiters themselves pay the employers to obtain the employment. So here it is not of consequence that the member should pay to the caddie directly the amount he has earned, or pay it indirectly through the medium of his 'caddie master.' The employment and discharge of the caddie during all of the time when he is not actually in the service of a member is wholly under the control of the country club, and this is the determinative fact in the matter."

In the case of Essex County Country Club v Chapman, 113 New Jersey Law, 182, the claimant was a caddy of the club and had entered the grounds of the club and was on his way to the caddie house where he was to report for work and await assignment to a player. As he was proceeding along a driveway he was overtaken by an employee of the club in an automobile, who gave Chapman a lift. Chapman was injured while alighting from the automobile on his way to the caddie house.

On the question of whether or not Chapman was an employee of the club, the New Jersey Court referred to and approved the above noted case in 163 Pac. Rep. 209, and after quoting the language of the California case as given above, the New Jersey Court continued:

"It would appear upon reason that a caddie at a golf club who is selected by a caddie master and is assigned to the various players by the caddie master as here, even if paid by the players, is an employee of the club, within the meaning of the Compensation Act.

The other point necessary to be discussed is whether or not the accident arose out of and in the course of the employment. Chapman had entered the grounds of the club and was on his way to a caddie house where he was to report for work and await assignment to a player. As as was proceeding along a driveway he was overtaken by an employee of the club in an automobile supplied by the club for the purpose of transporting caddies from the caddie house to the first tee when they were needed to begin a round with a player. He accepted a lift in this automobile and was injured when alighting from it."

"We think that there can be no doubt that the accident happened in the course of the employment."

In Indian Hill Club v Industrial Commission, 309 Ill. 271, Francis Wilburn, a boy twelve years old, was employed as a caddie by the club. The rules and regulations governing the employment and payment of caddies are again substantially the same as the employment in the instant case. On the morning in question young Wilburn reported at the club and was one of about one hundred caddies awaiting his number to be called. He saw that his number was toward the end of the list and about ten o'clock he and four other boys started to go home. When they got nearly to the street Wilburn was struck by an automobile which was using the private driveway of the club, and received the injuries for which compensation was asked.

On the question of employment, the court said:

"2. **When caddies are employees of a golf club:-** Caddies who work at a country club golf course and are under the control and direction of a caddy master, are employees of the club within the meaning of the Compensation Act, where it is a part of the function of the club to furnish caddies for golfers, whether or not the caddies are paid by the club or by the players themselves."

Whether or not the injury occurred during the course of the caddie's employment, the court said:

"It is also contended that the injury did not occur in the course of the em-

ployment and did not arise out of it. The defendant in error having waited until he saw there was no immediate prospect of his services being needed, was leaving the grounds of the club and while doing so, but still on the grounds, and about 30 feet from the clubhouse, was injured. It is not essential to the right to receive compensation that the employee should have been working at the particular time when the injury was received. The employment is not limited to the exact moment when he begins work or when he quits work. An injury accidentally received on the premises of the employer by an employee while going to or from his place of employment by a customary or permitted route, within a reasonable time before or after work, is received in the course of and arises out of the employment."

In neither the New Jersey nor the Illinois case given above, was the injured boy actually engaged in caddying at the time he was injured. In the New Jersey case he was on his way to the caddie pen when he received his injuries and in the Illinois case he had left the caddie pen when he was injured without doing any work as a caddie that morning and was on his way home. It would seem to follow from these cases that the normal natural activities of a caddie while in the caddie pen awaiting his number to be called, would be within the course of his employment.

As stated, the trial court considered that this case is controlled by the case in 127 Oh St 517, where the injured person, on the day he was injured, was helping to unload freight from a box car to the platform of the company by which the claimant was employed. The claimant grabbed the hat of a fellow employee, and threw it down the track. The fellow employee, at the same time, grabbed the claimant's hat and struck the claimant in the eye with his finger, causing an infection. The court held that the injury was non-compensable upon the ground that it did not arise in the course of and as a result of the

employment. The court considered at some length cases of injury caused by scuffling or horseplay and stated generally there could be no recovery for such injuries but recognized that there were exceptions to the general rule, as follows:

"Exceptions to the general rule arise where the employee who is injured through horseplay or fooling by other employees took no part in the fooling, but was attending to his duties or where he is injured by horseplay commonly carried on by the employees with the knowledge and consent or acquiescence of the employer."

It seems to the writer that the present case comes clearly within the scope of the second of these exceptions. When caddies of the age of this claimant are confined within the caddie pen with nothing to do but to amuse themselves, it is to be expected that they will play and engage in scuffling and horseplay. This is a very different case from one where grown men were unloading goods from a car and departed from their employment to indulge in horseplay.

The caddie master was Paul Frey and when asked whether or not the caddies had knives, he replied: "Oh, all the boys had knives." And he added that the boys in the caddie pen frequently played "mumble-ty-peg" which was played with knives. He recognized that the caddies would be playing games and amusing themselves because as he testified, the caddies "were required to remain in a confined area where they could amuse themselves." The caddie master said further, "there was nothing special they were required to do while they were waiting, just to amuse themselves." While the boys could go home, they were "cautioned not to go away, otherwise they would lose their connection with the club." Play started at eight o'clock and the caddies were expected to be present at that time. As to whether there were any rules or regulations controlling their activities in the caddie pen, the caddy master

100

testified: "They were permitted to play any games or do anything they wanted in the pen." When asked what games the boys played, his answer was, "Up to this time most of the boys had knives and they were playing this mumble-ty-peg."

It appears that there were some restrictions imposed by the caddie master after Toma was injured. Up to that time Frey, the caddie master. testified that "there was a lot of wrestling." He then added, "I stopped that." The inference was that he stopped it after Toma was injured.

Toma, the claimant, testified that on the morning of August 29, 1936, he went into the caddie pen and was playing "chubbies" which is a game played with knives, with the other caddies. Later he ate an apple, using his knife to cut the apple and Stonebrook, another caddy one year older than Toma, said to him, "the knife isn't sharp." Toma said, wholly in fun, "I am going to try it out on you." There was a scuffle and while Stonebrook was on his back he jerked and kicked his leg and accidentally struck Toma's hand holding the knife, driving the knife into Toma's leg, severing the principal artery.

Toma testified that he was holding the blade of the knife toward himself all the time so as to avoid any danger of cutting Stonebrook. Stonebrook testified that, "Toma was just in play" and that there was no bad blood of any kind between the boys, is shown by the fact that Stonebrook testified that "Toma was quite a good lad, I liked him a lot."

It thus seems clear that Toma's injury in this case comes within the exception stated by Judge Allen in the case in 127 Oh St 516, page 522, because he, in this case, was "injured by horseplay commonly carried on by the employees with the knowledge and consent or acquiescence of the employer."

It also appears clear that in this case there was a causal connection with the injury "through the activities. conditions and environments of Toma's employment at the time he was injured." If all that Toma and the other

caddies were expected to do while in the caddy pen was to amuse themselves, then any injury received while they were so amusing themselves would appear to come within the scope of their employment at the time. This case, therefore, falls within the principle of the case of East Ohio Gas Company v Coe, 42 Oh Ap 334, where the court held:

"1. Playful, sportive acts of employees are naturally and reasonably to be expected from the association of men in common work, and are a part of the environment of the employment.

2. Where the employment, through its environment, has a causal connection with an injury to an employee, suffered by him in the course of his employment, he is entitled to compensation under the Workmen's Compensation Law.

3. Where an employee. actually at work for his master, sustains injury because of the fooling and scuffling of a fellow employee, his right to compensation under the Workmen's Compensation Law is not defeated by the fact that he participated in the scuffling and thus, by yielding to a natural playful impulse, reasonably to be expected, contributed to his injury."

This is in accord with the weight of authority.

"An injury to an employee resulting from horseplay is held to arise out of and in the course of the employment if it apears that it arose out of certain definite kinds of play which had become customary in connection with the work, and which were known to the employer to be customary; and this rule has been applied both where the employee himself participated in the prank and where he was the innocent victim of the skylarking of his co-employees." 71 Corpus Juris 665.

Accord:

Kokoma Steel & Wire Co. v Eirich, 141 N. E. 796 (Ind.)

White v Stockyards Co., 104 Kan. 90. Glenn v Reynolds Spring Co., 225 Mich. 693.

The claimant's injury in this case arose out of and in the course of his employment by the Shaker Heights Country Club and was incidental to his activities while confined in the caddie pen. It is, therefore, my opinion that this case should be reversed and remanded.